1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GARY DEAN STORY,<br><br>    Petitioner,<br> v.<br><br>MICHAEL MARTEL, Warden, et al.,<br><br>    Respondents. | Case No.: 10-CV-00566-LHK<br><br>ORDER DENYING PETITION FOR<br>WRIT OF HABEAS CORPUS;<br>DENYING CERTIFICATE OF<br>APPEALABILITY |

16
17
18
19
20
21
22
23
24
25
26
27

   This habeas action arises out of the 1976 murder of Betty Vickers in her apartment in Mountain View, California.  Although Petitioner was arrested in connection with Ms. Vickers's death in 1976, he was not formally charged with the homicide at that time.  The case remained inactive for approximately twenty-five years, until 2000 or 2001, when the District Attorney's office began a process of investigating "cold cases" in which DNA testing of physical evidence might allow further investigation to proceed.  CT 968; RT 1764.  Upon initial investigation of the Vickers case, the DA's Office discovered that all of the physical evidence gathered by the police in 1976 was missing and could not be found.  CT 968; RT 1764.  In the course of this investigation, however, an investigator uncovered evidence of subsequent similar offenses by Petitioner and located a witness who claimed that Petitioner had boasted of getting away with a homicide in California.  CT 968; RT 1764-65.  Based on this new evidence, the DA's Office decided to proceed with prosecution of the case.  Petitioner was indicted in 2002, and a Santa Clara County jury found

28

1

United States District Court
For the Northern District of California

1  him guilty of first degree murder on October 4, 2005.  *People v. Story*, No. H030020, 2009 WL

2  1931798 (Cal. Ct. App. July 7, 2009), Resp. Ex. 10 ("Op."). at 2.  The California Supreme Court

3  denied his petition for review on October 14, 2009.  Resp. Ex. 12.

4       Petitioner timely filed a petition for writ of habeas corpus in this Court, claiming that the

5  prosecution of Petitioner twenty-five years after the homicide and following the loss of all physical

6  evidence violated his Due Process rights.  The Court has reviewed the briefs submitted by

7  Petitioner and Respondent, as well as the underlying record.  Although the Court is troubled by the

8  loss of evidence and the lengthy delay in this case, it cannot find that the state court's decision was

9  contrary to, or an unreasonable application of, clearly established federal law, or involved an

10 unreasonable determination of the facts.  Accordingly, the Court concludes that Petitioner is not

11 entitled to habeas relief and DENIES the petition.

12 **I.  Factual Background**

13      In 1976, Betty Vickers worked at the Palo Alto office of the Wall Street journal.  Op. at 3.

14 It was there that she met Petitioner, who also worked at the Wall Street Journal in Palo Alto.  *Id.*

15 After work, Ms. Vickers frequently socialized with friends at a bar called the St. James Infirmary.

16 *Id.*  Although Petitioner, who was married at the time, was not part of Ms. Vickers's social group,

17 he occasionally socialized at the St. James Infirmary as well and would sometimes chat with Ms.

18 Vickers and her group of friends there.  *Id.*

19      Prior to September 1976, Ms. Vickers shared a two-bedroom house with Arlene Bockholt

20 Baker in Mountain View.  *Id.*  Ms. Baker recalled two occasions when Petitioner visited Ms.

21 Vickers at the Mountain View house.  *Id.*  Once, Petitioner followed Ms. Vickers home from a

22 softball game, and they spoke on the front lawn for a while before Petitioner left.  *Id.*  The second

23 time, one morning in the summer of 1976, Ms. Vickers informed Ms. Baker that Petitioner had

24 spent the night in her bed and was still asleep in her room.  *Id.*  Ms. Vickers explained that nothing

25 had happened between her and Petitioner, as she was menstruating.  *Id.*

26      In early September 1976, Ms. Vickers moved into a second-floor apartment on Dana Street

27 in Mountain View.  *Id.* at 4.  One Sunday morning shortly after Ms. Vickers moved in, Suzanne

28

Case No.: 10-CV-00566-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF
APPEALABILITY

**United States District Court**
For the Northern District of California

1  Bonfield Lujan, who lived in the apartment below Ms. Vickers, and her friend Janet Rogers

2  Nielson, encountered Petitioner.  *Id.*  Petitioner was walking back and forth on the walkway in

3  front of Ms. Lujan's apartment.  *Id.*  He started yelling to the two women, stepped over a hedge

4  onto Ms. Lujan's deck, and repeatedly demanded to know where Ms. Vickers was.  *Id.*  When the

5  women told him they did not know Ms. Vickers, he reacted with hostility and accused them of

6  lying.  *Id.*  After arguing with them for about three minutes, he gave up and left.  *Id.* at 5.

7  However, later that evening, when Ms. Lujan was home alone tinting her hair, he returned to her

8  apartment and knocked several times on her front door.  *Id.*  Ms. Lujan could see no one through

9  the peephole, but when she opened the door, she discovered Petitioner crouched down in the

10  doorway.  *Id.*  He smelled of alcohol and explained that Ms. Vickers had stood him up.  *Id.*  Ms.

11  Lujan did not want to converse with Petitioner, but he had placed his foot over the threshold so that

12  she could not shut the door.  *Id.*  After listening to Petitioner for about twenty minutes, the timer for

13  her hair tinting went off, and Petitioner withdrew his foot from the threshold, allowing Ms. Lujan

14  to close the door.  *Id.*

15       On the evening of October 21, 1976, Ms. Vickers agreed to meet her friends Patricia Knight

16  and Shirley Ann Mitchell at St. James Infirmary.  *Id.* at 6.  Ms. Vickers arrived at the bar around

17  9:00 or 10:00 p.m. and had a drink with a group of her friends.  *Id.*  At some point in the evening,

18  Petitioner came over to the group and said hello.  *Id.*  He asked Ms. Knight if she wanted to go to

19  Denny's with him to have breakfast, but she declined.  *Id.*  Petitioner then turned to Ms. Vickers

20  and asked her something, and Ms. Knight saw Ms. Vickers shake her head.  *Id.*  Around 1:15 a.m.,

21  Ms. Vickers, Ms. Mitchell, and Ms. Knight got up to leave the bar.  *Id.* at 7.  Petitioner got up as

22  well and walked out behind Ms. Vickers and her friends.  *Id.*  As they walked to their cars, Ms.

23  Knight noticed Petitioner whisper something in Ms. Vickers's ear and saw Ms. Vickers shake her

24  head in response.  *Id.*  Before she got into her car, Ms. Vickers asked Ms. Mitchell if she would

25  accompany her home, but Ms. Mitchell was unable to do so.  *Id.*  Ms. Mitchell and Ms. Knight saw

26  Ms. Vickers drive off in the direction of her home and then saw Petitioner drive off in the same

27  direction.  *Id.*

28

3

Case No.: 10-CV-00566-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF
APPEALABILITY

The Mountain View police were summoned to Ms. Vickers apartment around 5:42 p.m. on October 22, 1976, after Ms. Vickers failed to show up for work. *Id.* They found her lying face-down on her bed with a nightshirt pulled halfway up her back. *Id.* at 8. The police collected evidence from the crime scene, including a pair of underwear, bed sheets, a tampon, wine glasses and a wine bottle, cigarette butts, fingerprints, vaginal and rectal smears, and hair samples. *Id.* at 8, 21. An autopsy indicated that Ms. Vickers died from manual strangulation not long after she left the St. James Infirmary. *Id.* at 8-9. The autopsy found no visible vaginal injuries and no indication of sperm in her body, but the vaginal samples were not tested for the presence of semen. *Id.* at 9. Because Petitioner had undergone a vasectomy in 1973, *Id.* at 14, the absence of sperm was not inconsistent with a theory that he had sexually assaulted Ms. Vickers. *See id.* at 9, 11. Tests of Ms. Vickers's sheets indicated a presumptive presence of semen; however, the tests were not conclusive and were not followed up with an examination for the presence of sperm. *Id.* at 10-11. A forensic scientist also conducted a blood-typing test on the presumed semen stain on the sheets. *Id.* at 10-11. While the test confirmed that Petitioner could have been a contributor, it conclusively excluded only about 10 percent of the population. *Id.* at 13, 20-21.

Petitioner was questioned and arrested in connection with Ms. Vickers's death, but was not charged with the murder. *Id.* at 13. As a result of the homicide investigation, however, the Probation Department petitioned to have Petitioner's probation revoked. CT 1120-21. The Superior Court judge refused to revoke probation, stating that the People had not made a serious effort to prove that Petitioner had violated any of the express conditions of his probation. CT 1121. The judge noted that while there had been "some innuendo as to the defendant's involvement with the homicide of Betty Vickers," Petitioner's involvement with her death remained "shadowy and inconclusive." *Id.*

No one was charged with the homicide of Betty Vickers, and the case remained open, but inactive, for approximately twenty-five years. In 2000 or 2001, after use of DNA evidence became widely accepted, the District Attorney's office began a process of reinitiating investigation in cases where new DNA testing techniques might allow "cold" cases to proceed. RT 1764; CT 968.

Case No.: 10-CV-00566-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

United States District Court
For the Northern District of California

1    When investigators began looking into the case of Betty Vickers, they discovered that all the

2    physical evidence collected in 1976 had been lost or destroyed.  Op. at 8; RT 1764.  In the course

3    of their initial investigation, however, investigators learned that Petitioner had since been

4    implicated, and in one case convicted, in two incidents of sexual assault that were likely admissible

5    as character evidence under California Evidence Code § 1108.  In one case, Petitioner was

6    acquitted on charges that he choked a woman on one occasion in 1980 and a month later held a gun

7    to her head and then raped her while grabbing her throat and choking her.  Op. at 18, 23.  In a

8    second case, Petitioner pled guilty to charges that he raped another woman at gun point in 1986.

9    *Id.* at 19-20, 24.  Evidence Code § 1108, which was enacted in 1995, also allowed the prosecution

10   to present evidence of two rapes that allegedly occurred prior to 1976.  One witness testified that in

11   1974, Petitioner struck her on the head with a gun, held her by the throat, and banged her head

12   violently against the headboard of her bed until she lost consciousness.  *Id.* at 16-17.  A second

13   witness testified that in the spring of 1976, after chatting with Petitioner at the St. James Infirmary,

14   Petitioner came to her house, entered uninvited, and raped her.  *Id.* at 17-18.  The investigation in

15   2000-2001 also located two ex-wives of Petitioner who both recalled Petitioner stating that he had

16   killed before and gotten away with it, in one instance specifying that he had killed someone in

17   California.  *Id.* at 15.

18           Based on this new evidence and the testimony of original witnesses who could still be

19   located, the prosecution filed an indictment on April 24, 2002.  *Id.* at 1; CT 968.  Following a jury

20   trial, Petitioner was found guilty of first-degree murder on October 4, 2005, and sentenced to life

21   imprisonment with the possibility of parole.  Op. at 1.  On appeal, Petitioner raised four violations

22   of his due process rights based on: (1) the 25-year pre-indictment delay which resulted in the loss

23   of all physical evidence; (2) the admission of four incidents of violent sexual conduct pursuant to

24   Evidence Code §§ 1108 and 1101(b); (3) insufficiency of evidence; and (4) the cumulative effect

25   of errors by the trial court.  Resp. Ex. 3.  Initially, the California Court of Appeal reversed

26   judgment, finding that the trial court prejudicially erred in admitting evidence of the sexual

27   offenses.  Op. at 2.  The California Supreme Court granted review and reversed, holding that such

28

5

evidence may be admitted where the defendant is accused of murder during the course of a rape. *Id.* It then remanded the case to the Court of Appeal to determine whether the pre-indictment delay violated Petitioner's due process rights. *Id.* The Court of Appeal found no violation of due process, *id.* at 32-33, and the California Supreme Court denied Petitioner's petition for review. Resp. Ex. 12. Petitioner's federal habeas petition is now before this Court.

## II. Discussion

### A. Standard of Review

Because the instant petition was filed after April 24, 1996, it is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which imposes significant restrictions on the scope of review in federal habeas corpus proceedings. Under AEDPA, a federal court may not grant a habeas petition challenging a state conviction unless the state court's ruling: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Rather, the state

Case No.: 10-CV-00566-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

1    court's application of the law must be "objectively unreasonable" to support granting the writ.  *See*

2    *id.* at 409.

3         In reviewing factual issues, the federal court must presume that factual determinations by

4    the state court are correct, absent clear and convincing evidence to the contrary.  *Miller-El*, 537

5    U.S. at 340; 28 U.S.C. § 2254(e)(1).  A state court decision "based on a factual determination will

6    not be overturned on factual grounds unless objectively unreasonable in light of the evidence

7    presented in the state-court proceeding."  *Miller-El*, 537 U.S. at 340.

8              **B.  Petitioner's Claims**

9         In his habeas petition, Petitioner argues that his prosecution for the murder of Betty

10   Vickers, twenty-five years after the homicide and at a time when the prosecution knew that all

11   physical evidence had been destroyed, violated his right to due process guaranteed by the Fifth and

12   Fourteenth Amendments of the Federal Constitution.  Although the claims in the petition are not

13   clearly delineated, the Court will treat the petition as presenting two separate claims for violations

14   of Petitioner's Due Process rights: (1) oppressive pre-indictment delay pursuant to *United States v.*

15   *Marion*, 404 U.S. 307 (1971), and *United States v. Lovasco*, 431 U.S. 783 (1977); and (2) failure to

16   preserve evidence pursuant to *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v.*

17   *Youngblood*, 488 U.S. 51 (1988).  *See* Pet. at 13 (stating that the state court decision was contrary

18   to the Supreme Court's decisions in *Marion*, *Lovasco*, *Trombetta*, and *Youngblood*).

19            **1.       Pre-Indictment Delay**

20        Petitioner argues that the twenty-five year delay between the murder of Ms. Vickers and

21   Petitioner's prosecution for that crime violated due process and deprived him of the right to a fair

22   trial.  More specifically, Petitioner claims that the state court's determination that the pre-

23   indictment delay was solely investigative and caused minimal prejudice was unreasonable in light

24   of the facts presented.  Although Petitioner does not suggest that the state court applied the wrong

25   legal principle in evaluating the delay, because Respondent raises that issue in its brief, the Court

26   will first address the legal principles applied by the state court and then turn to the reasonableness

27   of its factual determinations.

28

7

**United States District Court**
For the Northern District of California

### a.   Legal Standard for Pre-Indictment Delay

The Supreme Court has addressed the standard for determining whether pre-indictment delay amounts to a violation of the Due Process Clause in two decisions: *United States v. Marion*, 404 U.S. 307 (1971), and *United States v. Lovasco*, 431 U.S. 783 (1977).  In *Marion*, the Court stated that the applicable statute of limitations is the "primary guarantee against bringing overly stale criminal charges," but acknowledged that the statute of limitations does not fully define a defendant's rights.  *Marion*, 404 U.S. at 322, 324 (quoting *United States v. Ewell*, 383 U.S. 116, 122 (1966)).  It therefore found that the Fifth Amendment may, in some circumstances, require dismissal of a prosecution based on pre-indictment delay, even where the prosecution was brought within the applicable limitations period.[1]  *Id.* at 324.  Nonetheless, because the appellees in *Marion* failed to allege or prove actual prejudice and made no showing that the Government "intentionally delayed to gain some tactical advantage over appellees or to harass them," the Court found no violation of the Due Process Clause.  *Marion*, 404 U.S. at 325.  The Court declined to specify "when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution," reasoning that such a determination "will necessarily involve a delicate judgment based on the circumstances of each case."  *Id.* at 324-25.

Five years later, the Supreme Court in *Lovasco* stated that in claims of pre-indictment delay, "proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused."  431 U.S. at 790.  In evaluating the reasons for delay, the Court explained that a prosecutor does not "deviate from fundamental conceptions of justice" when he postpones indictment in order to ensure that prosecution is warranted or to allow full development of all charges prior to indictment.  *Id.* at 790-94.  Such investigative delay, the Court reasoned, "is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused.'"  *Id.* at 795 (quoting *Marion*, 404 U.S. at 324).  Accordingly, the Court held that "to

---

[1] The prosecution of Petitioner approximately twenty-five years after the homicide was not barred by the statute of limitations.  California does not impose a statute of limitations for the prosecution of murder cases or any other crime punishable by life imprisonment with or without the possibility of parole.  Cal. Penal Code § 799.

Case No.: 10-CV-00566-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

1    prosecute a defendant following investigative delay does not deprive him of due process, even if

2    his defense might have been somewhat prejudiced by the lapse of time." *Id.* at 796.  As in *Marion*,

3    however, the Court in *Lovasco* again declined to articulate a clear rule setting forth the

4    circumstances in which pre-indictment delay requires dismissal of a prosecution.  *Id.* at 796-97.

5    Noting that no court had considered the constitutional significance of various reasons for pre-

6    indictment delay in a sustained manner, the Supreme Court chose to "leave to the lower courts, in

7    the first instance, the task of applying the settled principles of due process . . . to the particular

8    circumstances of individual cases."  *Id.* at 797.

9         Since the Supreme Court's 1977 decision in *Lovasco*, the federal courts of appeals have

10   split on the proper standard to apply in cases alleging pre-indictment delay.  *See, e.g.*, *Hoo v.*

11   *United States*, 484 U.S. 1035, 1036 (1988) (White, J. dissenting) (dissenting from denial of

12   certiorari based on the "continuing conflict among the Circuits" regarding the correct test for

13   determining whether pre-indictment delay violates due process); *Jones v. Angelone*, 94 F.3d 900,

14   905 (4th Cir. 1996) (describing circuit split).  Under the Ninth Circuit standard, a defendant must

15   make some demonstration of actual prejudice and establish "some culpability on the government's

16   part either in the form of intentional misconduct or negligence."  *United States v. Mays*, 549 F.2d

17   670, 677-78 (9th Cir. 1977).  The court then balances the degree of prejudice, the length of delay,

18   and the Government's reasons for delay in order to determine whether the defendant's due process

19   rights were violated.  *Id.*; *U.S. v. Moran*, 759 F.2d 777, 781-82 (9th Cir. 1985).  Similarly, in the

20   Fourth Circuit, once a defendant establishes actual prejudice, the court balances the degree of

21   prejudice against the government's justification for the delay in order to determine whether the

22   delay amounts to a due process violation.  *Jones*, 94 F.3d at 904; *Howell v. Barker*, 904 F.2d 889,

23   895 (4th Cir. 1990).  Under both the Fourth and Ninth Circuit standards, it is possible to establish a

24   due process violation based on merely negligent delay, provided that the prejudice to the defendant

25   is sufficiently severe. *Moran*, 759 F.2d at 781-82; *Howell*, 904 F.2d at 895.

26        In contrast, most other circuits have held that to prevail on a claim of pre-indictment delay,

27   a defendant must make a two-part showing of (1) actual prejudice, and (2) intentional delay by the

28

9

**United States District Court**
For the Northern District of California

1   government to gain an unfair tactical advantage or for some other bad-faith motive.  *See, e.g.*,

2   *United States v. Crooks*, 766 F.2d 7, 11 (1st Cir. 1985), cert. denied, 474 U.S. 996 (1985); *United*

3   *States v. Hoo*, 825 F.2d 667, 671 (2d Cir. 1987), cert. denied, 484 U.S. 1035 (1988); *United States*

4   *v. Ismaili*, 828 F.2d 153, 167 (3d Cir. 1987), cert. denied, 485 U.S. 935 (1988); *United States v.*

5   *Crouch*, 84 F.3d 1497, 1514 (5th Cir. 1996) (en banc), cert. denied, 519 U.S. 1076 (1997); *United*

6   *States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992); *United States v. Sowa*,[2] 34 F.3d 447, 450 (7th Cir.

7   1994), cert. denied, 513 U.S. 1117 (1995); *United States v. Stierwalt*, 16 F.3d 282, 285 (8th Cir.

8   1994); *United States v. Engstrom*, 965 F.2d 836, 839 (10th Cir. 1992); *United States v. Hayes*, 40

9   F.3d 362, 365 (11th Cir. 1994), cert. denied, 516 U.S. 812 (1995).  In so holding, a number of these

10   courts have relied on subsequent statements by the Supreme Court suggesting that intentional or

11   reckless bad-faith delay by the government is required to establish a violation of due process.  *See*

12   *United States v. Gouveia*, 467 U.S. 180, 192 (1984) ("the Fifth Amendment requires the dismissal

13   of an indictment . . . if the defendant can prove that the Government's delay in bringing the

14   indictment was a deliberate device to gain an advantage over him and that it caused him actual

15   prejudice in presenting his defense"); *United States v. Eight Thousand Eight Hundred and Fifty*

16   *Dollars ($8,850) in United States Currency*, 461 U.S. 555, 563 (1983) ("claims [of pre-indictment

17   delay] can prevail only upon a showing that the Government delayed seeking an indictment in a

18   deliberate attempt to gain an unfair tactical advantage over the defendant or in reckless disregard of

19   its probable prejudicial impact upon the defendant's ability to defend against the charges"); *Arizona*

20   *v. Youngblood*, 488 U.S. 51, 57 (1988) ("Our decisions in related areas have stressed the

21   importance for constitutional purposes of good or bad faith on the part of the Government when the

22   claim is based on loss of evidence attributable to the Government.") (citing *Marion* and *Lovasco*).

23   Other than such brief statements in dicta, however, the Supreme Court has not provided

24

25

26   _____

    [2] Although the Seventh Circuit requires a showing of both actual prejudice and bad-faith motive on
27   the part of the Government, it departs from the other circuits by employing a burden-shifting test:
    once the defendant has shown actual prejudice, the burden shifts to the Government to demonstrate
28   that it did not delay purposefully to gain tactical advantage or for some other impermissible reason.
    *United States v. Sowa*, 34 F.3d 447, 450-51 (7th Cir. 1994).

                                                        10

Case No.: 10-CV-00566-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF
APPEALABILITY

United States District Court
For the Northern District of California

1  clarification, and the standard for determining whether pre-indictment delay violates due process

2  remains unsettled.

3      In evaluating Petitioner's due process claim based on pre-indictment delay, the California

4  Court of Appeal explained that "[a] claim based upon the federal Constitution . . . requires a

5  showing that the delay was undertaken to gain a tactical advantage over the defendant," in addition

6  to actual prejudice.[3]  Op. at 30 (quoting *People v. Nelson*, 43 Cal. 4th 1242, 185 P. 3d 49 (2008)).

7  Thus, although the Court of Appeal did not identify the standard applied by the Ninth Circuit, it

8  applied a standard identical to that employed by the majority of the federal courts of appeals.  A

9  state court decision is contrary to clearly established Supreme Court precedent "if the state court

10  applies a rule that contradicts the governing law set forth in [Supreme Court] cases."  *Williams*

11  *(Terry)*, 529 U.S. at 405.  Here, while Supreme Court precedent clearly establishes that due process

12  may be violated by intentional, bad-faith pre-indictment delay that results in actual prejudice to the

13  defendant, there is no clearly established Supreme Court precedent that dictates a more general

14  standard for determining when pre-indictment delay violates due process.  The rule applied by the

15  state court fits squarely within the parameters established by *Marion* and *Lovasco* and conforms to

16  the approach taken by most of the Circuits.  *See Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004)

17  (noting that lower federal court precedent, although not controlling under AEDPA, may be relevant

18  if it "illuminates the application of clearly established federal law as determined by the United

19  States Supreme Court").  Accordingly, the legal standard applied by the state court cannot be

20  deemed contrary to, or an unreasonable application of, clearly established federal law.  *See Carey*

21  *v. Musladin*, 549 U.S. 70, 76-77 (2006) (reasoning that state court cannot be said to have

22  unreasonably applied clearly established federal law where lack of Supreme Court holdings had led

23  to diverging standards in federal courts of appeals).

---

[3] In considering Petitioner's claim under California law, the Court of Appeal applied a balancing test similar to that employed by the Ninth Circuit.  Op. at 30.  The Court of Appeal found that Petitioner demonstrated some minimal prejudice from the delay, that the Government's justification for the delay was relatively strong, and that the record did not establish even prosecutorial negligence.  *Id.* at 31-32.  Accordingly, the Court of Appeal found no due process violation under the balancing test required by California law.  *Id.* at 32.

11

### b.   State Court's Determination of the Reasons for Delay

Petitioner's challenge focuses not on the legal standard applied by the state court, but on the state court's factual determination that the prosecution delayed indictment for legitimate investigative purposes, rather than from bad-faith motives, and caused only minimal prejudice to Petitioner's defense.  Under the AEDPA, factual determinations by the state court are presumed correct, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  *Miller-El*, 537 U.S. at 340.

Petitioner appears to argue that the delay in prosecution must be considered in bad faith because when it sought indictment in 2001, the government knew that all of the physical evidence had been destroyed and that, therefore, Petitioner could not corroborate his claim of innocence. Pet. 21.  Petitioner also argues that, even if the initial delay was investigative and not in bad faith, the twenty-five years that passed between the offense and the filing of charges cannot be attributed solely to investigative delay.  Traverse 12.  He notes that the prosecution knew, or should have known, of all four of petitioner's sexual crimes by 1986, but nonetheless did not reopen investigation for another fifteen years.  Traverse 10-11.  He thus argues that any permissible investigative delay must have ended in 1986 and that the additional delay was unjustified and in bad faith.  Traverse 12.

The California Court of Appeal considered and rejected these arguments on appeal.  It found that the full body of evidence in the case did not exist in 1976, and the police did not have enough evidence to charge Petitioner until 2001, when investigators discovered the post-1976 incidents of rape and located witnesses who could testify that Petitioner admitted to getting away with a homicide.  Op. at 31.  It thus found that the prosecution acted properly in refraining from seeking an indictment in 1976 and in waiting to file charges until the new evidence discovered in 2001 "turned an extremely weak case against defendant into a virtually overwhelming case."  *Id.* at

12

Case No.: 10-CV-00566-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

United States District Court
For the Northern District of California

1  31-32.  The Court of Appeal acknowledged that the police could have discovered Petitioner's

2  history of sexual assaults as early as 1986, but found that the failure to allocate scarce prosecutorial

3  resources to the case prior to 2001 was not a decision made in bad faith in order to cause prejudice

4  to Petitioner or even one that would amount to prosecutorial negligence.  *Id.* at 32.  Having

5  reviewed the record, this Court agrees that the pre-indictment delay in this case, though extremely

6  lengthy, was not motivated by bad faith or other impermissible motive.  It appears that the

7  prosecution made a considered decision in 1976 that it lacked sufficient evidence to convict

8  Petitioner; that in the intervening years the case was reasonably given low priority; and that only in

9  2001, when advances in DNA testing prompted the District Attorney's Office to reopen

10  investigation of cold cases, did sufficient evidence to indict Petitioner come to light.  Moreover, as

11  discussed in more detail below, the loss of physical evidence that occurred between the original

12  homicide investigation and Petitioner's indictment appears to have been the result of negligence,

13  rather than bad faith, and there is no evidence that the prosecution intentionally delayed seeking

14  indictment until it knew the physical evidence could not be recovered.  Petitioner does not point to

15  any evidence or testimony in the record that suggests that the prosecution delayed in order to gain a

16  tactical advantage, to harass Petitioner, or for some other impermissible motive.  Accordingly,

17  Petitioner has failed to rebut the presumption of correctness applied to the state court's factual

18  determination and has not shown that the state court's finding of a lack of bad faith or intent to gain

19  strategic advantage was unreasonable in light of the evidence presented.

20  **c.  State Court's Finding of Minimal Prejudice**

21  Petitioner also argues that the state court's factual finding that Petitioner failed to

22  demonstrate actual prejudice was unreasonable.  Traverse at 13.  As discussed above, in assessing

23  Petitioner's federal claim for pre-indictment delay, the state court reasonably applied a rule that

24  requires a two-part showing of actual prejudice and a bad-faith motive on the part of the

25  Government.  Because the state court found that the prosecution did not intentionally delay

26  indictment in order to gain an unfair tactical advantage or for some other impermissible motive, it

27  could have denied Petitioner's federal claim without assessing the prejudice caused by the delay.

28

13

United States District Court
For the Northern District of California

1    However, because the state court also applied a balancing test to evaluate Petitioner's claim under

2    California state law, it reached the issue of prejudice, and this Court will address it briefly as well.

3         Petitioner claims that he was severely prejudiced by the loss of all physical evidence in the

4    case because that evidence represented his only means of corroborating his denial of guilt and

5    countering the circumstantial evidence connecting him to the crime.  Traverse 13-14.  He argues

6    that the physical evidence would have been determinative of the case and may have produced DNA

7    evidence corroborating Petitioner's claim that he was not in Betty Vickers's apartment on the night

8    of her death and was not involved in the crime.  Traverse 14.  Petitioner also suggests that he was

9    prejudiced by the loss, over time, of the reporter's transcript from the January 1977 probation

10   hearing, reasoning that since the witness testimony presented at the hearing did not satisfy the

11   lesser burden of proof for revocation of probation, at least some of that testimony must have been

12   exculpatory.  Pet. 16-17.

13        In evaluating Petitioner's claim of actual prejudice, the trial court painstakingly considered

14   each piece of lost evidence, both from the crime scene at Betty Vickers's apartment and evidence

15   associated with Petitioner's other sexual assaults, and addressed Petitioner's claims that witnesses'

16   memories had faded over time.[4]  RT 1756-1763.  The Court of Appeal reviewed the trial court's

17   findings on appeal and considered Petitioner's claim that the loss of physical evidence was critical

18   to his defense.  Op. at 26-29.  The Court of Appeal agreed that Petitioner had demonstrated some

19   prejudice, particularly as to the lost bed sheet, which might have been further tested for the

20   presence of sperm or other biological evidence.  *Id.* at 30.  However, the Court of Appeal found

21   that because the exculpatory value of the lost evidence was purely speculative, it was not sufficient

22   to establish more than minimal prejudice.  *Id.*  As to most of the physical evidence, such as the hair

23   samples and fingerprint cards, the Court concluded that, at best, this evidence could have shown

24   that someone other than Petitioner was in Ms. Vickers's apartment at some point in time.  *Id.*  As to

25   ──────────────

26   [4] Before the state court, Petitioner argued that he was prejudiced by the unavailability of several
     witnesses in the Vickers case, the lack of independent recollection of several witnesses who
     testified at his trial, and the loss of evidence and witnesses associated with Petitioner's other sexual
27   crimes.  Op. at 21-25.  Petitioner does not renew these arguments here.  Instead, his petition
     focuses almost exclusively on the loss of the physical evidence gathered from Ms. Vickers's
28   apartment in 1976, with some mention as well of the lost probation hearing transcript.

Case No.: 10-CV-00566-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF
APPEALABILITY

1   the bed sheet, even if it tested positive for the presence of sperm as Petitioner speculated it might,

2   the Court of Appeal was not convinced that such a finding would have been sufficient to overcome

3   the reasonable inferences drawn from the evidence of Petitioner's other sexual crimes, his

4   interactions with Ms. Vickers, his subsequent admissions that he had killed and gotten away with

5   it, and other evidence suggesting that he was the perpetrator.  *Id.* at 28-29.

6          This Court agrees that the exculpatory value of the lost evidence was purely speculative,

7   particularly when compared to the weight of compelling circumstantial and character evidence

8   connecting Petitioner to the crime.  Petitioner's claim that testing of the bed sheets, fingerprints,

9   hair samples, and other evidence would have excluded him as a contributor is itself speculative,

10  and even if Petitioner's speculations are correct, none of the evidence would have conclusively

11  demonstrated that he was not in Ms. Vickers's apartment and could not have committed the crime.

12  It is possible, of course, that if none of the physical evidence implicated Petitioner, a jury might

13  have discounted the weight of the other evidence presented – that is, Petitioner's demonstrated

14  interest in Betty Vickers, his association with her on the night of the murder, his previous

15  threatening behavior in her apartment complex, his history of sexual violence, and his subsequent

16  statements that he had killed before and gotten away with it.  It is also conceivable that the physical

17  evidence might have enabled Petitioner to build a defense by pointing to some other potential

18  perpetrator.  These theories of prejudice, however, require the Court to assume both that the

19  physical evidence would not have implicated Petitioner and that a jury would have found this

20  sufficient to outweigh the other compelling evidence presented.  Considered in this context, the

21  prejudice to Petitioner from the loss of evidence is very speculative.

22          To establish a due process violation based on pre-indictment delay, a petitioner must

23  demonstrate actual prejudice.  *Marion*, 404 U.S. at 324.  The federal courts of appeals have

24  interpreted this requirement as imposing a heavy burden on defendants, requiring proof that is

25  "definite and not speculative." *Moran*, 759 F.2d at 782; *see also United States v. Barken*, 412 F.3d

26  1131, 1134 (9th Cir. 2005) ("[A] defendant must prove that he suffered actual, non-speculative

27  prejudice from the delay, meaning proof that demonstrates exactly how the loss of evidence or

28

15

United States District Court
For the Northern District of California

1    witnesses was prejudicial.  The defendant's burden to show actual prejudice is heavy and is rarely

2    met.") (internal quotation marks and citations omitted); *United States v. Jackson*, 549 F.3d 963,

3    970-71 (5th Cir. 2008) (finding no actual prejudice based on lost evidence and witnesses).

4    Accordingly, given the purely speculative nature of the prejudice to Petitioner, the Court cannot

5    find the state court's finding of only minimal prejudice unreasonable.

6         The Court acknowledges that the combination of the lengthy pre-indictment delay and the

7    loss of all physical evidence in this case present an unusual situation.  Nonetheless, the federal

8    courts have sustained indictments in similar situations.  *See Woodfox v. Cain*, 609 F.3d 774, 804

9    (5th Cir. 2010) (finding no indication of due process violation where petitioner was reindicted in

10   1998 for a crime committed in 1972 and both physical evidence, including blood-stained clothing,

11   and witnesses had become unavailable); *United States v. Seale*, 600 F.3d 473, 479 (5th Cir. 2010)

12   (finding that 40-year pre-indictment delay did not violate due process because defendant failed to

13   demonstrate that the government intentionally delayed in bad faith); *Wilson v. McCaughtry*, 994

14   F.2d 1228, 1234-37 (7th Cir. 1993) (finding that 16-year delay did not violate due process where

15   witnesses died in intervening years); *Stoner v. Graddick*, 751 F.2d 1535, 1540-45 (11th Cir. 1985)

16   (finding 19-year delay did not violate due process where potential witnesses had died).  The scope

17   of review under the AEDPA is narrow, and this Court is not permitted to grant habeas relief simply

18   because it might have reached a different outcome in the first instance.  *See Williams*, 529 U.S. at

19   411-13.  In this case, the Court cannot find that the state court applied a legal standard that was

20   contrary to, or an unreasonable application of, Supreme Court precedent, nor can the Court find

21   that the state court's factual determinations were objectively unreasonable.   Accordingly,

22   Petitioner is not entitled to relief on his claim of pre-indictment delay.

23                        **2.        Failure to Preserve Evidence**

24        In addition to his due process claim based on pre-indictment delay, Petitioner also presents

25   a claim based on the loss or destruction of physical evidence collected from Betty Vicker's

26   apartment in 1976, pursuant to the Supreme Court's decisions in *California v. Trombetta*, 467 U.S.

27   479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988).  As an initial matter, it appears that

28

                                           16

1    Petitioner's *Trombetta-Youngblood* claim is unexhausted.  Before a federal court may grant habeas

2    relief, a habeas petitioner must exhaust the remedies available in state court. 28 U.S.C.

3    § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  To satisfy the exhaustion

4    requirement, the petitioner must invoke one complete round of the state's appellate review process,

5    *id.* at 845; *Redd v. McGrath*, 343 F.3d 1077, 1082 (9th Cir. 2003), and present each federal claim

6    to the state's highest court.  *Insyxiengmay v. Morgan*, 403 F.3d 657, 667-68 (9th Cir. 2005).  In this

7    case, the state trial court was presented with and ruled on Petitioner's *Trombetta* claim as a pretrial

8    motion.  RT 753-756; Op. at 26 n.10.  However, Petitioner did not present this claim on direct

9    appeal to the California Court of Appeal or in his petition for review before the California Supreme

10   Court.  *See* Resp. Ex. 3 (opening appellate brief); Ex. 5 (appellate reply brief); Ex. 8 (supplemental

11   appellate brief); Ex. 11 (petition for review to the California Supreme Court).  While Petitioner's

12   appellate briefs discuss the loss of evidence due to the passage of time between Betty Vickers'

13   murder and the 2002 indictment, Petitioner raised this issue on appeal only in the context of a due

14   process claim based on pre-indictment delay, not as an independent claim for failure to preserve

15   evidence under *Youngblood* or *Trombetta*.  *See* Resp. Ex. 3, at 14-23; Ex. 5, at 2-4; Ex. 8, at 3-11;

16   Ex. 11, at 6-13.  Moreover, although the Court of Appeal noted the trial court's *Trombetta* decision

17   in a footnote, neither the Court of Appeal nor the California Supreme Court addressed the issue.

18   Accordingly, Petitioner's *Trombetta-Youngblood* claim is unexhausted and cannot serve as a

19   ground for granting the Petition.  Nonetheless, this Court may deny a petition on the merits,

20   notwithstanding Petitioner's failure to exhaust, 28 U.S.C. § 2254(b)(2), and Respondent has briefed

21   the issue in order to allow the Court to consider the merits.  Because the Court agrees with

22   Respondent that the claim should be denied on the merits, the Court will turn to the merits of

23   Petitioner's *Trombetta* claim.

24        The Supreme Court's decisions in *Trombetta* and *Youngblood* govern due process claims

25   arising from the prosecution's failure to preserve "potentially useful" evidence.  *Trombetta*, 467

26   U.S. at 486-89; *Youngblood*, 488 U.S. at 57-58.  In contrast to materially exculpatory evidence,

27   "potentially useful" or "potentially exculpatory" evidence is evidence "of which no more can be

28

17

1    said than that it could have been subjected to tests, the results of which might have exonerated the

2    defendant." *Youngblood*, 488 U.S. at 57.  Under *Youngblood* and *Trombetta*, the failure to

3    preserve such potentially useful evidence does not constitute a denial of due process unless the

4    defendant can show bad faith on the part of the State.  *Id.* at 58; *Illinois v. Fisher*, 540 U.S. 544,

5    548 (2004).  This bad-faith requirement applies even in cases where the potentially exculpatory

6    evidence "provides a defendant's only hope for exoneration and is essential to and determinative of

7    the outcome of the case."  *Fisher*, 540 U.S. at 548-49 (internal quotation marks and citations

8    omitted).

9         Petitioner argues that the loss of all the physical evidence collected from Betty Vickers'

10   apartment constitutes a denial of due process because the evidence would have played a significant

11   role in his defense, comparable evidence could not be obtained, and the loss occurred due to bad

12   faith on the part of the police.  Pet. 20-21.  He challenges the state court decision on grounds that

13   the court's finding that there was no evidence of bad faith was based on an unreasonable

14   determination of the facts in light of the evidence presented.  Traverse 9.  As noted above, this

15   Court is required to presume that the state court's factual determinations are correct, and Petitioner

16   bears the burden of rebutting the presumption of correctness by clear and convincing evidence.  28

17   U.S.C. § 2254(e)(2).  Here, Petitioner does not point to any specific evidence of bad faith contained

18   in the record that the state court overlooked or did not adequately consider.  Rather, Petitioner

19   argues generally that the loss of all the physical evidence in the case, without explanation and in

20   violation of well-established police department policy, must be considered to be in bad faith.

21   Pet. 21; Traverse 9-10.

22        The Court agrees that the loss of evidence in this case is both perplexing and disturbing.  As

23   Petitioner points out, the Mountain View Police Department appears to have lost or destroyed

24   every single piece of physical evidence obtained in the case, and not a single Police Department

25   employee who testified could explain its disappearance.  Nonetheless, as Petitioner acknowledges,

26   the trial court held an extensive evidentiary hearing on the loss of evidence and heard testimony

27   from eight present and former members of the Mountain View Police Department, some of whom

28

Case No.: 10-CV-00566-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF
APPEALABILITY

1    supervised the evidence room during their employment.  Traverse at 9; RT 609-738.  After hearing

2    this testimony and evaluating its credibility, the trial court concluded that there was no evidence of

3    bad faith and that the evidence was likely lost due to police negligence, possibly at the time that the

4    Department moved from one location to another.  RT 753-54.  Petitioner does not point to any

5    testimony suggesting that the Department destroyed the evidence "in a calculated effort to

6    circumvent the disclosure requirements established by *Brady v. Maryland*," *Trombetta*, 467 U.S. at

7    488, or to otherwise prejudice Petitioner.  Accordingly, he has failed to meet his burden to rebut the

8    state court's factual findings with clear and convincing evidence.

9         To the extent that Petitioner asks this Court to find that the unexplained loss or destruction

10   of evidence in contravention of official policy constitutes bad faith as a matter of law, this

11   argument is also unavailing.  Petitioner cites no case law to support this claim, and he concedes

12   that the Supreme Court has not provided a definition of bad faith in the context of a *Trombetta-*

13   *Youngblood* claim.  Traverse 9.  The Court agrees that whether destruction of evidence occurred in

14   accordance with established policy may be relevant in determining whether evidence was

15   destroyed in bad faith.  *See Trombetta*, 467 U.S. at 488 ("the officers here were acting in good faith

16   and in accord with their normal practice") (internal quotation marks and citation omitted); *Fisher*,

17   540 U.S. at 548 ("police acted in good faith and in accord with their normal practice") (internal

18   quotation marks and citation omitted).  However, it is difficult to imagine a negligent loss of

19   evidence that occurs in compliance with department policy, and in *Youngblood* the Supreme Court

20   found that the negligent loss of potentially exculpatory evidence by the police did not violate due

21   process.  *See Youngblood*, 488 U.S. at 58.  The *Youngblood* Court also noted that the bad-faith

22   analysis turns on "the police's knowledge of the exculpatory value of the evidence at the time it

23   was lost or destroyed."  *Id.* at 56 n.*.  This suggests that bad faith in the context of lost or destroyed

24   evidence requires some intent to withhold evidence that may have value to the defense and does

25   not turn on police compliance with evidence destruction policies.  *See also Phillips v. Woodford*,

26   267 F.3d 966, 987 (9th Cir. 2001) (denying *Trombetta* claim where petitioner failed to show "that

27   the State destroyed the [evidence] to prevent disclosure of evidence favorable to the defense");

28

Case No.: 10-CV-00566-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

*Mitchell v. Goldsmith*, 878 F.2d 319, 322-23 (9th Cir. 1989) (denying *Trombetta* claim based on negligent loss of line-up photographs). Thus, the Court cannot conclude that the state court's refusal to find bad faith based on the unexplained and apparently negligent loss of evidence in violation of police department policies amounts to an objectively unreasonable application of clearly established Federal law. 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to relief based on his *Trombetta-Youngblood* claim.

### III. Conclusion and Certificate of Appealability

For the reasons set forth above, the Court concludes that Petitioner has failed to demonstrate that the state court's ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Accordingly, the petition for writ of habeas corpus is DENIED.

The federal rules governing habeas cases challenging state convictions require the district court to grant or deny a certificate of appealability in the same order in which a habeas petition is denied. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2245. Under the standard set forth in the AEDPA, Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or to demonstrate that a reasonable jurist could debate whether the petition should have been resolved in a different manner. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case. The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: January 10, 2011

_____
LUCY H. KOH
United States District Judge

United States District Court
For the Northern District of California